IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

BRENDA SPRAGUE,                      )
                                     )
            Plaintiff,               )
                                     )
     v.                              ) Case No.
                                     ) 12-3455-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting            )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Brenda Sprague seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under the Social Security Act
("the Act").  Plaintiff argues that the ALJ erred in (1) failing
to properly develop the record by ordering a consultative exam to
test plaintiff's mental functioning, and (2) in deriving a
residual functional capacity that is not based on the substantial
evidence.  I find that the substantial evidence in the record as
a whole supports the ALJ's finding that plaintiff is not
disabled.  Therefore, plaintiff's motion for summary judgment
will be denied and the decision of the Commissioner will be
affirmed.

*I.   BACKGROUND*

On July 29, 2009, plaintiff applied for disability benefits
alleging that she had been disabled since April 1, 2009.

Plaintiff's disability stems from Langerhans histiocytosis[1] and hypertension. Plaintiff's application was denied on September 23, 2009. On April 6, 2011, a hearing was held before an Administrative Law Judge. On June 17, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 17, 2012, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850–51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th

---

[1]Histiocytosis is a general name for a group of syndromes that involve an abnormal increase in the number of immune cells called histiocytes. There are three major classes of histiocytoses, one of which is Langerhans cell histiocytosis, which is also called histiocytosis X. Histiocytosis X has typically been thought of as a cancer-like condition. More recently researchers have begun to suspect that it is actually an autoimmune phenomenon, in which immune cells mistakenly attack the body, rather than fight infections. Extra immune cells may form tumors, which can affect various parts of the body including the bones, skull, and other areas.
http://www.nlm.nih.gov/medlineplus/ency/article/000068.htm

Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of

3

a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
                    No = go to next step.

     4.   Does the impairment prevent the claimant from doing
past relevant work?

                    No = not disabled.
                    Yes =  go to next step where burden shifts to Com-
missioner.

     5.   Does the impairment prevent the claimant from doing any
other work?

                    Yes = disabled.
                    No = not disabled.

## IV.  THE RECORD

     The record consists of the testimony of plaintiff and
vocational expert George Horne, in addition to documentary
evidence admitted at the hearing.

## A.   ADMINISTRATIVE REPORTS

     The record contains the following administrative reports:

## Earnings Record

     The record shows that plaintiff earned the following income
from 1971 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1971 | $ 281.10 | 1991 | $    0.00 |
| 1972 | 458.96 | 1992 | 0.00 |
| 1973 | 1,072.37 | 1993 | 2,545.68 |
| 1974 | 5,635.73 | 1994 | 8,152.68 |
| 1975 | 0.00 | 1995 | 8,464.84 |
| 1976 | 0.00 | 1996 | 1,181.21 |
| 1977 | 6.88 | 1997 | 9,684.00 |

| 1978 | 1,938.42 | 1998 | 14,825.61 |
|------|----------|------|-----------|
| 1979 | 48.70 | 1999 | 16,178.70 |
| 1980 | 3,035.05 | 2000 | 17,894.04 |
| 1981 | 0.00 | 2001 | 18,348.97 |
| 1982 | 3,624.58 | 2002 | 13,670.51 |
| 1983 | 4,494.01 | 2003 | 2,454.72 |
| 1984 | 0.00 | 2004 | 19,078.29 |
| 1985 | 0.00 | 2005 | 15,591.48 |
| 1986 | 0.00 | 2006 | 22,118.35 |
| 1987 | 0.00 | 2007 | 12,728.15 |
| 1988 | 0.00 | 2008 | 17,144.62 |
| 1989 | 0.00 | 2009 | 6,111.45 |
| 1990 | 0.00 | 2010 | 0.00 |

(Tr. at 111).

**Function Report**

In a Function Report dated August 14, 2009 (Tr. at 136–143), plaintiff described her day as follows:

> I take my pain medication and about 30 minutes later I'm able to walk without the severe pain. I shower and get dressed in loose fitting clothing because it makes it a little easier to work. I eat 1 slice of toast so I can take my diabetes medication. I dust the furniture and my husband vaccums [sic] because it hurts for me to do that and he cooks me some kind of noodle soup for my lunch because a bland soup is easier for me to keep down without vomiting. My husband leaves for work at 2:30 p.m. and I lay down for about an hour. My daughter that moved with her husband from Arkansas to Missouri about 8 months ago when I started getting really sick to help me with household chores comes to my house after she gets off work and cooks dinner for me and my husband (she lives about 6 houses from our house). She also does our laundry and folds it and I put it away. She also lives close to our home and if I need anything I call her and she can get here quickly if I need anything. I grocery shop usually on Fridays with my husband driving me and carrying in the supplies and helping me put them away.

I will read my books and go to bed around 10:00.  I wake up
several times during the night because of the pain or
vomiting.

Throughout this form plaintiff described a lot of what
others do, but she did not describe very much of what *she* does
during a normal day.

Plaintiff reported that she takes care of her husband but
that she does not do much.  He takes care of their animals.  Her
daughter helps her with housekeeping (plaintiff dusts and cleans
her bedroom) and cooking, although plaintiff does cook once in a
while -- she prepares her own meals about twice a week for 15 to
20 minutes each time.  She drives if there is no one else to
drive her.  She wakes up several times a night due to pain and
vomiting.  Plaintiff reported that she does not get her hair cut
very often because she can't sit for any period of time.  She is
able to feed herself, but she has no appetite.  Plaintiff is able
to go out alone, but she tries not to due to pain and vomiting
which can "come on unexpectedly."  Plaintiff shops with her
husband for about an hour once a week.  Plaintiff is able to pay
bills, count change, and use a checkbook or money orders.

Plaintiff reads a lot.  She reads for about an hour at a
time, and then she gets up and moves around to stop the cramping.
Plaintiff talks with friends on the phone or they come to her
house to visit two or three times a week.

Plaintiff was asked to circle the activities affected by her

conditions.  She died not circle talking, hearing, seeing, understanding, following instructions, using her hands or getting along with others.  She can walk about 400 feet before needing to rest for 5 or 10 minutes.  She listed no limit to her ability to pay attention.  She is able to follow instructions, but sometimes she has to look at written instructions several times and sometimes oral instructions have to be repeated.  She has never had problems with authority figures.  She has always handled stress well, "but lately I get very upset and cry a lot".

**Disability Report**

In a Disability Report dated August 3, 2009, plaintiff reported that she weighed 118 pounds (Tr. at 157–167).  In this form plaintiff attributed her weight loss to "loss of appetite" (Tr. at 158).  When she was asked how her conditions limit her ability to work, she did not mention vomiting several times every day.  She did say that her "langerhans causes the bones in my body to break at anytime without warning."  She stopped working on April 1, 2009, because of her constant pain (Tr. at 158).

**Disability Report – Appeal**

"[N]othing has changed since the last report[,] I vomit all day long[,] I have a hard time walking[,] I can't remember a lot of things[,] I'm in a lot of pain all the time" (Tr. at 175).

***B.  SUMMARY OF TESTIMONY***

During the April 6, 2011, hearing, plaintiff testified; and George Horne, a vocational expert, testified at the request of the ALJ.

**1.  Plaintiff's testimony.**

At the time of the hearing plaintiff was 56 years of age (Tr. at 26).  Plaintiff is 5'4" tall and weighs 132 pounds (Tr. at 26).  Plaintiff previously lost 82 pounds due to "loss of appetite, and pancreatitis" (Tr. at 27).  Plaintiff is married and her husband works (Tr. at 27).  She has a driver's license but is unable to drive due to her medications -- "I just don't trust my reaction times, so I don't drive any longer" (Tr. at 27).  Plaintiff gets rides from her husband or daughter (Tr. at 27).

Plaintiff is unable to work due to constant pain and frequent vomiting (Tr. at 29-30).  The vomiting started approximately June 2007 which was a few months before her first attack of pancreatitis (Tr. at 37).  On an average day plaintiff vomits about 4 times (Tr. at 37).  Her doctors suspect the vomiting might be related to her Langerhans but they are not sure (Tr. at 38).  Plaintiff has a tightening in her esophagus which is swelling caused by the vomiting (Tr. at 38).  She has a fairly

consistent cough[2] associated with the nodules in her lungs (Tr. at 39).

Plaintiff had surgery on her right leg and hip associated with the Langerhans, and she had chemotherapy due to lytic lesions on her bones (Tr. at 40). Since then, she has had persistent pain (Tr. at 40). Plaintiff was able to perform a sedentary job all the while she was undergoing chemotherapy (Tr. at 40-41). She suffered renal failure, but then went back to work for five years (Tr. at 41). She was "just so tired and vomiting all the time, and missing work" so she quit working in April 2009 (Tr. at 41). Plaintiff was asked how much work she was missing because of her symptoms, and she said, "Oh, well, more with the hospitalizations. One time I was off for two and a half months. With the hospitalization and surgery and then I'd go back to work and I could work maybe two weeks, and I'd start getting sick again, and just off and on, and I know my record must be terrible" (Tr. at 41).

Plaintiff cannot lift more than 2 to 5 pounds (Tr. at 30). She is unable to say how long she can walk before needing a break because she gets out of breath (Tr. at 30). Plaintiff can stand still for about 5 minutes and then she either has to sit down or

---

[2]Plaintiff had coughed a "couple of times" during the hearing and plaintiff's counsel described that as a "fairly consistent" cough, to which plaintiff agreed (Tr. at 39).

move around (Tr. at 30).  She can sit for 10 to 15 minutes before needing either to get up or at least shift her position (Tr. at 30).  She cannot bend forward at the waist without pain; she cannot squat; she can use her hands (Tr. at 30-31).

Plaintiff's pain is mostly in her right thigh and lower back into her left side (Tr. at 31).  The pain occurs constantly, but she gets sharp pains about once an hour (Tr. at 31, 35).  With medication, her constant dull pain is a 6 or a 7 on a scale of 1 to 10 (Tr. at 35).  The sharp shooting pains are a 9 out of 10 (Tr. at 35).  There are no precipitating factors (Tr. at 31).  For relief plaintiff will lie on a carpeted floor and stretch for about 10 to 15 minutes, and she does that 4 or 5 times a day (Tr. at 31).

Plaintiff has had no recent changes to her medication (Tr. at 29).  Her medications cause extreme fatigue and problems with short-term memory (Tr. at 29).  Plaintiff has noticed memory problems because she cannot remember what she watches on the news, and she never gets her kids' names right (Tr. at 31-32).  She sleeps only 3 to 4 hours a night because her leg pain wakes her up and she has hot flashes (Tr. at 32, 36).  She does not take naps during the day (Tr. at 36).

Plaintiff lives in a duplex with her husband (Tr. at 32).  She is able to put laundry in, but her husband takes it out of the washer and puts it in the dryer because it's too heavy for

plaintiff (Tr. at 32). Plaintiff is able to dust and do other minor things around the house (Tr. at 32). She does not vacuum, she does not shop (Tr. at 32). Plaintiff only leaves her home to go to doctor appointments (Tr. at 33). She no longer uses a computer (Tr. at 33). She watches television without difficulty (Tr. at 33). She reads biographies (Tr. at 33).

Plaintiff used to take her grandchildren to the zoo every month, but she can't do that anymore (Tr. at 33). A typical day now starts at 4:30 when she gets up and watches the news (Tr. at 33). Her husband works evenings, and he gets up at 9:00 and they spend the morning together (Tr. at 34). Plaintiff does a few chores around the house (Tr. at 34). After her husband goes to work, her daughter comes over to make sure things are taken care of and to visit with plaintiff (Tr. at 34). Plaintiff drinks no alcohol (Tr. at 38). She used to smoke a pack of cigarettes a day, but she is now down to about 4 cigarettes per day (Tr. at 38).

Plaintiff's last cardiac procedure was a catheterization (Tr. at 34). Plaintiff's diabetes is "well under control" unless she gets pancreatitis, and then she has to use an insulin shot (Tr. at 34-35). Plaintiff has hypertension, and her medication causes a dry mouth and makes her very tired (Tr. at 39). She was unable to identify any symptoms caused by the hypertension but noted that it was not under control even with medication (Tr. at

39).

## 2.  **Vocational expert testimony.**

Vocational expert George Horne testified at the request of
the Administrative Law Judge.  Plaintiff's past relevant work
consists of customer order clerk, DOT 249.362-026 with an SVP of
4 (semi-skilled) and sedentary; sales clerk, DOT 290.477-014,
with an SVP of 3 (semi-skilled) and light; and administrative
clerk, DOT 219.362-010, with an SVP of 4 (semi-skilled) and light
(Tr. at 42).

The first hypothetical involved a person who could perform
light work but would need to alternate sitting and standing every
30 to 60 minutes throughout the day (Tr. at 43).  The vocational
expert testified that such a person could not work as a customer
order clerk or a sales clerk, but the person could work as an
administrative clerk (Tr. at 43).

The second hypothetical involved a person who could lift and
carry up to 5 pounds, stand or walk up to 5 minutes at a time,
sit for 15 minutes at a time, could only occasionally bend or
stoop and could never squat (Tr. at 44).  The vocational expert
testified that such a person could not perform any of plaintiff's
past relevant work (Tr. at 44).  With the claimant's age,
education and work experience, such a person could not work
because even a sedentary job would require lifting up to 10
pounds on an occasional basis, and the sit/stand option would

interfere with pace persistence and productivity (Tr. at 44).

The third hypothetical was the same as the first except the person would need to take two unscheduled breaks throughout the day for 10 to 15 minutes at a time due to the need to vomit or lie on the floor and stretch (Tr. at 44-45, 46). The vocational expert testified that such a person likely could not work due to the unscheduled nature of the breaks (Tr. at 45).

If the individual had limitations of memory, concentration and attention caused by fatigue as a medication side effect, and was therefore limited to simple, unskilled work, the person could not perform plaintiff's past relevant work because unskilled work is an SVP of 1 or 2 (Tr. at 45).

## C.    *SUMMARY OF MEDICAL RECORDS*

Most of plaintiff's medical records pre-date her alleged onset date and occurred while she was engaged in substantial gainful activity.

On February 28, 2005, plaintiff saw William Wester, M.D., at Orthopaedic Specialists of Springfield, complaining of right leg pain, worse with walking (Tr. at 289). Testing revealed that plaintiff had a bone lesion in her right femur (thigh bone) (Tr. at 290). Dr. Wester diagnosed plaintiff with a probable pathologic fracture.[3]

---

[3]A pathologic fracture occurs when a bone breaks in an area that is weakened by another disease process.

On March 14, 2005, Dr. Wester took a biopsy and performed surgery to repair plaintiff's fracture (Tr. at 290). At a follow-up appointment on March 25, 2005, plaintiff told Dr. Wester that her symptoms had improved and that she had no discomfort with moving her hip and knee (Tr. at 290). The biopsy revealed that plaintiff had probable histiocytosis (Tr. at 290).

On April 18, 2005, plaintiff met with Amy Rabe, M.D., at Oncology-Hematology Associates, to discuss treatment options for her histiocytosis (Tr. at 339). Plaintiff weighed 177 pounds. An MRI revealed that plaintiff had a lesion in her femur and left iliac (pelvic bone). A CT scan of her chest showed an upper lung nodule. Dr. Rabe recommended that plaintiff get a second opinion and see Dr. Clouse to discuss the possibility of radiation.

On May 9, 2005, plaintiff followed up with Dr. Rabe after undergoing radiation treatment (Tr. at 337). Plaintiff's blood pressure was 169/109, she weighed 179 pounds and she continued to smoke a half a pack of cigarettes per day. Plaintiff continued to report hip and back pain. Dr. Rabe observed that plaintiff continued to walk with a slight limp. Despite her pain and other symptoms, plaintiff reported that she continued to work full time at a desk job. Dr. Rabe recommended that plaintiff undergo chemotherapy.

On May 16, 2005, plaintiff saw Dr. Rabe (Tr. at 335). Plaintiff reported that she had been having severe pain in her

lower back and right hip. "Her pain previously was reasonably well controlled with 1 to 2 hydrocodone/APAP [narcotic]. However, with 2 tabs of hydrocodone each time over the weekend her pain remains severe." Dr. Rabe began administering a four-course cycle of chemotherapy.

At a follow-up appointment with Dr. Rabe on July 11, 2005, plaintiff reported that she was doing better with her gait (Tr. at 331-332). "[B]ilateral hip pain has mostly resolved, although she continues to have back pain about the lumbar area. She uses approximately four hydrocodone/Tylenol, although at bedtime she occasionally uses an oxycodone [narcotic] which she states gives her an all-night pain relief better than hydrocodone does. She has had minimal nausea and noticed only mild hair loss. She continues to have some fatigue, although is able to maintain her full-time work status." Dr. Rabe noted that plaintiff was "definitely clinically improving" and had tolerated her treatment well. Plaintiff had her next course of chemotherapy.

On August 12, 2005, plaintiff completed chemotherapy (Tr. at 314, 327). At a follow-up appointment on September 9, 2005, plaintiff was feeling well in general and had "good ambulation" (Tr. at 327). She weighed 173 pounds and her blood pressure was 146/90. "Clinically she is doing well, although imaging studies, obtained on August 2nd, show only stable disease. Shortness of breath with showers only, and no shortness of breath with mild

exertion, possibly related to humidity in shower. Patient does have lung involvement by her disease." Plaintiff requested that Dr. Rabe refill plaintiff's hypertension medication since plaintiff was seeing Dr. Rabe more frequently than her primary care physician, and Dr. Rabe agreed to do so.

On November 3, 2005, plaintiff followed up with Dr. Rabe (Tr. at 325–326). Plaintiff reported that "her pain is under good control with only an occasional need for oxycodone two to three tabs as needed." Plaintiff's blood pressure was 165/110, and she weighed 177 pounds. Her gait was much improved, and her blood work looked good. Plaintiff's Langerhans histiocytosis was stable, "overall, patient is doing well."

On February 2, 2006, Dr. Rabe examined plaintiff (Tr. at 324). "She feels well in general, and her pain is well managed with oxycodone two to three tabs q. [every] 4 h. p.r.n. [as needed] for pain. She is working full-time and only experiences intermittent hip discomfort which is well managed with her existing pain medications." Plaintiff's weight had gone up some since her last visit -- she weighed 181 pounds. Her blood pressure was 182/97. Her whole body scan, which had been done on January 26, showed some improvement in her existing lesions with no new lesions. A CT scan of her chest and abdomen showed no new findings in her lungs and a negative examination in her abdomen. "Patient has very stable disease at this time, and her symptoms

have overall improved after treatment."

About a year later, on January 24, 2007, plaintiff saw Dr. Wester, her orthopedic doctor, complaining of left leg pain (Tr. at 288). Plaintiff reported her pain had been present for the last six to eight weeks, it was worse with activity, she was not having any issues with night pain, and she was able to go up and down stairs. Plaintiff had full range of motion in her hip, knee, ankle and foot. She had mild discomfort with seated straight leg raising on the left. Dr. Wester took x-rays of plaintiff's pelvis and left hip. Plaintiff had no bony abnormalities of her knee. She had mild arthritic changes at the hips, but Dr. Wester did not think that was causing her left leg pain. Dr. Wester assessed "left leg pain, etiology of which may be mechanical low back." He recommended physical therapy and prescribed Lodine, a non-steroidal anti-inflammatory.

About nine months later, on September 12, 2007, plaintiff went to the hospital with complaints of abdominal pain and vomiting for the last two or three days (Tr. at 389-399). Plaintiff's abdominal pain was a 7 out 10 at its worst, and "pain medications seem to make it better." Plaintiff was taking hydrocodone 5/500 one to two pills every four hours as needed for pain, and Atenolol 100 mg daily for hypertension. Plaintiff was working at Legal Services at the time, and she was smoking about 4 cigarettes per day. "Smoking cessation was discussed with

her." During a review of systems, plaintiff reported bone pain associated with her histiocytosis X especially in her lower back and right hip. Plaintiff denied depression, and on exam she was observed to be alert and oriented times three with normal mood and affect. Her blood pressure was 200/100. She denied any change in weight.

Plaintiff's pancreatic enzymes were elevated. Her glucose was elevated. She was treated by Karl J. Orscheln, M.D., who initially assessed pancreatitis,[4] hypertension, elevated blood glucose, and history of histiocytosis X. Plaintiff was admitted and put on IV morphine for her pain and was given nothing by mouth until her abdominal pain was under control.

Plaintiff was kept in the hospital on IV morphine and IV hydration and eventually transitioned to a clear liquid diet and then to a regular diet. She was discharged on September 17, 2007. Her discharge diagnoses were:

1. Acute pancreatitis, presumed secondary to gallstones.

2. Hypertension.

3. Impaired glucose tolerance.

4. Tobacco abuse.

5. History of histiocytosis X.

---

[4]Pancreatitis is inflammation in the pancreas. The pancreas produces enzymes that assist digestion and hormones that help regulate the way the body processes sugar (glucose).

Plaintiff was given prescriptions for Percocet (narcotic), Atenolol (a diuretic used to treat hypertension), and Lisinopril.[5] She was told to eat a low-fat diabetic diet and to stop smoking.

On December 20, 2007, plaintiff followed up with Robert Ellis, M.D., at Oncology-Hematology Associates, for her histiocytosis (Tr. at 314-315). Plaintiff reported that she had some aching in her right femur but felt fairly well overall. Her blood pressure was 212/120 and her weight was 178 pounds. On exam plaintiff was noted to be pleasant, alert and oriented times three. Her physical exam was normal. A CT scan of her chest showed no changes (Tr. at 314, 387). A bone scan showed no active bone lesions (Tr. at 314, 388). Dr. Ellis assessed Langerhans histiocytosis with severe hypertension and diabetes mellitus as secondary conditions. He found that her Langerhans histiocytosis was clinically stable and that she had a good prognosis. He added Hydrochlorothiazide (a diuretic) for hypertension and refilled her Hydrocodone (200 pills).

On February 28, 2008, plaintiff was seen at the emergency room with complaints of abdominal pain, nausea, and vomiting that had started "yesterday" (Tr. at 375-386). Her mood and affect were normal. Her pancreatic enzymes (lipase) were markedly

---

[5]An ACE inhibitor used to treat hypertension. It causes dilation of blood vessels.

elevated.

> Says her whole family had viral gastroenteritis last week, including herself. Resolved in everybody about 4 days ago. Was OK and went back to work for 2 days. Started yesterday began having nausea and vomiting with ~10 episodes of vomiting. Had 2 episodes of diarrhea. No abdominal pain at that time. Before going to bed, ate a piece of toast with her pills and immediately vomited it back up. Went to bed and began having abdominal pain "above her belly button and up and to the left." Described it as "my insides being twisted." No radiation. Was 4/10. Was unable to sleep due to pain. At about 0100 this AM, was tired of not being able to sleep so drank a coke with ~3 oz of rum in it. Said that "drinking the booze" made the pain much worse and wasn't able to sleep much after that. Tried her home Norco [narcotic] 5/500 mg x2 tabs without relief, so came to ER this am because pain up to 8-9/10 and "unbearable." Says this is exactly like her previous episode of pancreatitis. . . . No appetite and reports nothing "has stayed down in 2 days." Reports she drinks 1-2 hard drinks about every 2-3 weeks.

Plaintiff listed her current medication as Hydrocodone/ acetaminophen (narcotic), lisinopril (for hypertension) and Metformin (for diabetes). She did not list Atenolol or hydrochlorothiazide, which had been prescribed two months earlier, for hypertension. She reported smoking 3/4 pack of cigarettes a day and occasional alcohol use. Plaintiff denied depressed mood, anxious mood, or problems sleeping. Plaintiff's blood pressure, 200/110, was elevated "likely secondary to inability to take meds, plus stress of pain. No signs of end organ damage and thus no evidence for HTN [hypertension] emergency."

Shelby Hahn, M.D., admitted plaintiff to the hospital and

diagnosed her with pancreatitis.  Plaintiff was given IV

morphine, IV hydration, IV hypertension medication, insulin, and

a nicotine patch.  She had an ultrasound, the findings of which

"could represent pancreatitis," and an MRI of her abdomen which

was consistent with pancreatitis.

Plaintiff had nothing by mouth for 3 days and improved;

however, once food was introduced her abdominal pain returned.

She had nothing by mouth for another two days and then she was

switched to oral medications and food.  By the time of her

discharge on March 6, 2008, she was tolerating a full diet.

"Throughout her entire hospital stay her blood pressures had been

quite difficult to control."  Once she was able to tolerate oral

medications, she was started on Metoprolol[6]

> and at the day of discharge her blood pressures are well
> controlled with systolic blood pressures between 1 teens and
> 140s to 150s and normal diastolics up to approximately 90
> diastolic.  The difficulty with the blood pressure was
> discussed with the patient.  She was somewhat worried about
> the numerous medications.  She was told that as an
> outpatient her primary care physician could titrate the
> blood pressure medications of his choosing up and decrease
> the number of medications she would be taking.

Her condition on discharge was good.  "Advised complete

---

[6]Metoprolol is a beta blocker.  Beta blockers, also known as
beta-adrenergic blocking agents, are medications that reduce your
blood pressure.  Beta blockers work by blocking the effects of
the hormone epinephrine, also known as adrenaline.  When you take
beta blockers, the heart beats more slowly and with less force,
thereby reducing blood pressure.  Beta blockers also help blood
vessels open up to improve blood flow.

alcohol abstinence."

On March 12, 2008, plaintiff followed up with Dr. Landholt at PatientCare Family Clinic (Tr. at 274). Plaintiff continued to improve and denied vomiting. She weighed 163 pounds. "Blood pressure has remained at her discharge levels, metoprolol is making her very tired at this point although this is somewhat improved." Dr. Landholt declined to change her medication. He told her to follow up in three weeks.

On April 4, 2008, plaintiff followed up with Dr. Landholt (Tr. at 272). Her blood pressure was 230/108 and her weight was 169 pounds. "Patient is extremely tired from the medications, blood pressure has not responded. Is exercising and eating well." Dr. Landholt stopped plaintiff's Metoprolol but continued her prescription for Clonidine[7] and Lisinopril/Hydrochlorothia-zide.

Three months later, on July 2, 2008, plaintiff went to the emergency room at CoxHealth complaining of abdominal pain, nausea and vomiting for the past week and a half (Tr. at 201-205, 233-254). At the time she came to the hospital, she was in kidney failure. Plaintiff's medications were listed as Lisinopril (for

---

[7]Clonidine is used alone or in combination with other medications to treat high blood pressure. Clonidine is in a class of medications called centrally acting alpha-agonist hypotensive agents. It works by decreasing your heart rate and relaxing the blood vessels so that blood can flow more easily through the body.

hypertension), Metformin (for diabetes), Vicodin (narcotic), Clonidine (for hypertension), and Metoprolol[8] (for hypertension). Plaintiff continued to smoke but said she had not used alcohol in several months. She was working as a paralegal. Plaintiff's blood pressure was 172/76. Her mood and affect were appropriate and she was alert and oriented times three. There was no weakness, range of motion restriction, or tenderness in any joint. Plaintiff's pancreatic enzymes were markedly elevated, her glucose was elevated, her liver enzymes were low. She was assessed with acute pancreatitis causing acute renal failure, severe dehydration, and intractable pain; diabetes mellitus type 2 uncontrolled; hypertension uncontrolled; and intractable nausea and vomiting. Due to renal failure and severe dehydration, plaintiff was admitted to intensive care. Plaintiff's medications were stopped and she was given IV hydration, IV blood pressure medication, IV pain control, and other IV medications affecting her magnesium and potassium due to kidney failure. A CT scan confirmed pancreatitis.

Plaintiff's nausea and vomiting improved on her first day in the hospital. By the third day she was on food and was able to take oral pain medications. She was discharged home on July 6,

---

[8]There is no explanation for the change in medications from plaintiff's last visit with her primary care physician who discontinued Metoprolol.

2008, with a recommendation to have her gallbladder removed.  Her
discharge medications were Vicodin (narcotic), Clonidine (for
hypertension), Metformin (for diabetes), and Metoprolol (for
hypertension).

On July 10, 2008, plaintiff saw Dr. Landholt for a follow up
(Tr. at 209).  "We do not have any discharge information [from
the hospital but] the patient is improved and was advised by her
doctor to get a referral to have her gallbladder out.  She is
unaware of the studies that they did [or] any results."
Plaintiff weighed 147 pounds which was a decrease of 22 pounds
since her last visit the beginning of April 2008.

On July 16, 2008, John C. Crighton, M.D., at CoxHealth,
surgically removed plaintiff's gallbladder (Tr. at 208).

Eight and a half months later -- April 1, 2009 -- is
plaintiff's alleged onset date.

Three months later, on June 30, 2009,  plaintiff met with
Rick Klingensmith, a nurse practitioner, at Oncology-Hematology
Associates (Tr. at 217-218).  Plaintiff weighed 138 pounds, which
was 9 pounds less than she weighed a year earlier.  Her blood
pressure was 188/101.  Plaintiff's last visit in this office was
over a year and a half earlier.

Plaintiff reported that gallbladder surgery had "had no
effect" and that she had been hospitalized "approximately four
times" over the last 18 months.  In fact, plaintiff had not been

hospitalized since her gallbladder surgery a year earlier and had been hospitalized a total of three times, all before her alleged onset date.

Plaintiff reported that over the past few months her "energy is improving, as well as her appetite. . . . Overall she feels fairly well today."  Plaintiff did report worsening of bone pain, specifically in her back, pelvis and right arm.  On exam plaintiff was noted to be pleasant, alert and oriented times three.  There was tenderness to palpation "throughout nearly the entire spine, the right humerus and the entire pelvis."  A bone scan was recommended.

On July 13, 2009, plaintiff underwent a bone scan which was compared to her previous bone scan dated December 12, 2007 (Tr. at 226).  The scan showed some chronic deformity in her right leg (where she had previously had surgery) which was "stable."  She had some degenerative change in the lower lumbar spine at L4 and the right acetabulum[9] but the remainder of her skeleton was

---

[9]



unremarkable and stable.

On July 23, 2009, plaintiff had an MRI of her right hip which revealed mild degenerative changes, and she had an MRI of her back, the results of which "are consistent with advanced degenerative changes" (Tr. at 223–225).

On July 29, 2009, plaintiff filed her application for disability benefits.

On September 19, 2009, Anthony Zeimet, D.O., performed a consultative examination in connection with plaintiff's application for disability benefits (Tr. at 263–268).

HISTORY OF PRESENT ILLNESS:  . . . She states that . . . [s]he has some problems with her pancreas and her liver, as well as her bones.  She has widespread bone pain and in fact, had a fracture on her right leg that required an intramedullary rod placement and screw placed to help stabilize that on the right side [which occurred in March 2005].  She notes that she has high blood pressure.  It is not very well controlled.  She is only on clonidine at this time.  They believe that her blood pressure is elevated because of her pain.  She notes that she has diabetes but is unsure of when her last hemoglobin A1c [which measures the average blood glucose level for the past three months] was.  She did not check her blood sugar today and really cannot tell me what her average blood sugars are.  She states she has never been told that she has diabetes to the eye, kidney, or the nerves.  She has widespread body aches and pains.  Primarily, her right hip bothers her a lot, and she has back pain in the left side. . . .  She is  unable to tell me what makes the pain worse or better.  She rates her pain currently 4/10.  She notes that she has lesions on her lungs that are attributed to her Langerhans as well.  She does have some shortness of breath with activity and is able to cook and do light housework.  She denies any wheezing but coughs.  She does not use any inhaler.  She has had [four] bouts with pancreatitis that she thinks were probably due to her Langerhans.  She said, "I guess."  Her last episode, though, was in January 2009.  She states she vomits a lot.

She states she vomits at least 2 times a day and is unsure exactly why. She does not have abdominal pain. She just vomits usually early in the morning. This is why she left her job working as a receptionist for a legal services company.

On a self-questionnaire, the patient states she can sit, stand, or walk for about an hour at a time each. She can lift and carry about 10 pounds. . . . She does not require anything to help her walk. She currently does not have a job. She last worked in April 2009 as a receptionist for a legal services company. . . . She does admit to smoking, and she is working on quitting. She does not drink alcohol. She can drive a car.

Plaintiff reported that she has chronic pancreatitis with the last episode in January 2009; however, the medical records show that plaintiff's last episode was actually in early July 2008. Plaintiff listed her current medications as Metformin (for diabetes), Clonidine (for hypertension), and Hydrocodone (narcotic), 7.5 mg 2 tablets four times a day. Plaintiff did not report any mental symptoms. She continued to smoke.

Plaintiff's blood pressure was 180/88. She weighed 133 pounds (which was a decrease of 14 pounds in the past 14 months -- in July 2008 she weighed 147 pounds). Plaintiff was able to get on and off the exam table and up and out of the chair without much difficulty. She appeared "somewhat hesitant" to do the activities or range of motion, but she was able to do them without much difficulty. She had no muscle atrophy, no spasm, no tenderness. She was able to follow simple directions, her affect was normal, and her personal hygiene was good.

Plaintiff had no limitation in range of motion of any extremity.  She had full range of motion in shoulders, elbows, wrists, knees, hips, and ankles, although she did have some pain during range of motion testing of her right hip.  Plaintiff was able to walk without any assistive device, do heel-to-toe walk, walk on heels and toes, and squat.  She had full range of motion of her cervical and lumber spine.  Straight leg raising was normal.

Dr. Zeimet reviewed plaintiff's right hip x-ray, an MRI of the lumbar spine from July 2009, a bone scan from July 2009, an initial history and physical from July 2008, and hospital records from July 2008 when plaintiff had pancreatitis.

Dr. Zeimet assessed right hip osteoarthritis, degenerative joint disease in her back without radiculopathy, diabetes type 2, uncontrolled hypertension, history of pancreatitis "last episode in January 2009" and history of Langerhans histiocytosis.

> IMPRESSION:  . . . With regard to [her] ability to work an 8-hour day with normal breaks to sit, stand, and walk; I think she actually can work an 8-hour day.  I think her probably most significant limiting factor is the pain that she has in her back and in her right hip, and she may need to alternate positions to alleviate pain periodically throughout the day.  However, I do believe that she can work and perform light duty such as secretarial duty that she was doing back in April.  She had no limitation in range of motion including squatting.  Her gross and fine motor hand grip and grasp were intact.  She does not require any devices for ambulation.  Her vision is normal, uncorrected. Hearing is intact.  Communication skills are decent.  She does have the ability to travel and drive a car.

On December 9, 2009, plaintiff saw Dr. Ellis for a follow up on histiocytosis (Tr. at 312–313).  It had been two years since she had seen Dr. Ellis.  Plaintiff complained of increased pain in her right hip.  Plaintiff said she had a general feeling of "not feeling well."  She was taking 8 to 10 hydrocodone pills on a daily basis.  Her medications included Clonidine (for hypertension), Metformin (for diabetes), MS Contin (narcotic) and Norco (narcotic).  Dr. Ellis noted that plaintiff had been "without definitive evidence of disease recurrence" since she finished chemotherapy in August 2005.

Plaintiff reported fatigue so severe that it interfered with her activities of daily living.  "Her fatigue is so bad that she had to stop working."  She reported musculoskeletal pain mainly in the right inguinal area[10] and pain that radiates down her right femur.  She reported a daily cough, abdominal pain/ discomfort, joint pain, and difficulty falling or staying asleep.

---

[10]



She denied dizziness.  On exam Dr. Ellis found no joint tenderness, no muscle tenderness.  Her lab results showed her glucose was high at 212.  She was assessed with history of Langerhans histiocytosis, "severe, uncontrolled pain" for which Dr. Ellis prescribed more narcotic pain medication, and "severe hypertension" for which she was directed to follow up with her primary care physician (plaintiff's blood pressure was 202/101). Dr. Ellis recommended that plaintiff have a skeletal survey and CT scans.  Plaintiff did not mention vomiting at any time during this visit.

The next day, on December 10, 2009, plaintiff had a bone survey, which revealed no new lesions (Tr. at 371-372).  There appeared to be cystic areas in plaintiff's left hip but they were of uncertain significance and unchanged since 2007.  CT scans of plaintiff's abdomen, pelvis, and chest revealed nodular densities in both lungs (Tr. at 373-374).  They were "of uncertain significance" and a follow up study in three to six months was recommended "if clinically indicated" for further evaluation.

On January 2, 2010, plaintiff saw John Steinberg, M.D., at the Ferrell-Duncan Clinic, to discuss a possible lung biopsy (Tr. at 302-304).  Plaintiff weighed 142 pounds.  Her blood pressure was 198/108.  Plaintiff complained of shortness of breath and a wheezing cough.  She continued to smoke.  Plaintiff specifically denied "unexpected weight gain or weight loss, chronic fatigue,"

31

nausea, gastrointestinal pain, change in bowel habits, myalgias (muscle pain), new arthralgias (joint pain), muscle atrophy, weakness or depression.  On exam Dr. Steinberg heard no wheezes, rales or rhonchi, but "a few fine crackles on expiration possibly."  She was alert and oriented times three, moving all four extremities, she had a normal gastrointestinal exam, and no other abnormal findings.

On January 8, 2010, plaintiff saw John Wolfe, M.D., at the Ferrell-Duncan Clinic, for a pulmonary consultation (Tr. at 367-369).  Plaintiff weighed 145 pounds.  Her blood pressure was 200/100.  Plaintiff continued to smoke.  "She has lost 60 pounds and attributes that to 3 episodes of acute pancreatitis in the past year."  In fact, plaintiff had not had an episode of pancreatitis for the past 18 months, and 18 months earlier she weighed 147 pounds, only two pounds heavier than on this day.  Additionally, six days earlier when she saw Dr. Steinberg, plaintiff had specifically denied "unexpected weight gain or weight loss."  During a lengthy review of systems, plaintiff did not mention vomiting.  Dr. Wolfe heard no wheezes, no rales and no rhonchi during an examination of plaintiff's lungs.  A

spirometry test[11] was normal.  Dr. Wolfe diagnosed plaintiff with
stable interstitial markings in both lungs, nodular densities in
both lungs, and chronic bronchitis.  He recommended that
plaintiff stop smoking, and he scheduled her for a lung biopsy.

On February 4, 2010, plaintiff saw Crystal Powell, a
physician's assistant at PatientCare Family Clinic, to check her
blood pressure (Tr. at 285–286).  Plaintiff weighed 142 pounds,
and her blood pressure was 182/102 and then 174/98.  Plaintiff
had gone to the hospital that morning for pre-biopsy labs, and
her biopsy was actually cancelled because her blood pressure had
been 200/112 at the hospital.  "Pt admits that her BP has been
running high for at least the past year despite taking clonidine
daily; it is usually in the 160s/100s at home.  She denies any CP
[chest pain], dyspnea [shortness of breath], HAs [headaches],
palpitations, or vision changes."  Plaintiff's last lab work was
two years earlier, including an A1C test.  Plaintiff reported
that she "quit smoking last week."

---

11



Spirometry measures how
fast and how much
air you breathe out

> While here, pt mentions she is also having a problem
> w/persistent emesis [vomiting].  She is throwing up at least
> 3x/day, often much more, for at least the past year.  She
> has lost about 30 pounds since it started.  She denies any
> hematemesis [vomiting blood], abdominal pain, or bloody or
> black/tarry stools.  No diarrhea or constipation. . . .
> [S]he has had CT scans of abdomen and chest every 3 months
> and per patient, she has never been told that anything
> unusual has been found in the abdomen.

Lisinopril was added to treat plaintiff's hypertension.

Fasting labs were drawn, and plaintiff was directed to keep a

blood pressure log and return in one week to see Dr. Landholt.

Plaintiff was told to take Prilosec (an over-the-counter

medication which decreases the amount of acid produced in the

stomach) and an upper GI was recommended.

Six months later, on August 9, 2010, plaintiff followed up

with Dr. Ellis (Tr. at 309-311).  Plaintiff complained of

increasing pain in her paraspinous area.[12]  She also reported

periods of chest pain and shortness of breath.  However, lung

biopsies were negative.  Dr. Ellis noted that plaintiff had not

had any recurrence of her histiocytosis since completing

chemotherapy in August 2005.  Plaintiff continued to smoke.  She

weighed 147.6 pounds and her blood pressure was 204/125.  On exam

Dr. Ellis heard no wheezes, rhonchi or rales.  Plaintiff had

tenderness to palpation of a right paraspinous area at about T9,

---

[12]The muscles next to the spine are called the paraspinal
muscles.  They support the spine and are the motor for movement
of the spine.

10 and 11.  She was alert and oriented times three, her judgment was normal, her insight was normal.  She was assessed with severe uncontrolled hypertension, pain "overall better control," and chest pressure.  She was referred to Dr. Ray Rosario for evaluation of chest pain, her narcotic pain medicine was increased, and an MRI of the spine and plain films of the right hip were ordered.

That same day, Dr. Ellis completed a "Physician's Statement for Disabled License Plates/Placard" (Tr. at 269).  With two checkmarks, Dr. Ellis indicated that plaintiff had a "Permanent Disability" and that she "cannot ambulate or walk 50 feet without stopping to rest due to a severe and disabling arthritic, neurological, orthopedic condition or other severe and disabling condition."  The form included a restriction based on shortness of breath, but that restriction was not checked by Dr. Ellis.

On August 18, 2010, plaintiff had an x-ray of her hip, which revealed degenerative changes (Tr. at 359).  An MRI of her thoracic spine showed mild degenerative changes without significant narrowing of the spinal canal (Tr. at 363).

On September 2, 2010, plaintiff saw Raymond Rosario, M.D., at the Ferrell-Duncan Clinic, for a cardiology consultation (Tr. at 296-300).  Plaintiff weighed 150 pounds, and her blood pressure was 191/102.  Plaintiff described chest pain lasting about one to two minutes and occurring about three times a week.

Plaintiff continued to smoke 3/4 pack of cigarettes per day.  She used alcohol occasionally.  During a review of systems, plaintiff reported shortness of breath on exertion, nausea, and insomnia. She did not mention vomiting.  She denied palpitations, edema, fainting, or wheezing.

On exam plaintiff was noted to be alert and oriented, her behavior and affect were appropriate.  Her lungs were normal, her abdomen was normal, she had normal gait and station with normal muscle strength and tone.

Due to her family history of heart disease and her significant history of tobacco abuse, plaintiff was started on Coreg (a beta blocker used to treat hypertension), Lisinopril (used to treat hypertension), and aspirin, a blood thinner.  Dr. Rosario discussed plaintiff having an angiogram[13] and she agreed to proceed.  "Discussed health risks of smoking and benefits of

---

[13]An angiogram is an imaging test that uses x-rays to view your body's blood vessels.  Physicians often use this test to study narrow, blocked, enlarged, or malformed arteries or veins in many parts of your body, including your brain, heart, abdomen, and legs.  When the arteries are studied, the test is also called an arteriogram.  If the veins are studied, it is called a venogram.  To create the x-ray images, your physician will inject a liquid, sometimes called dye, through a thin, flexible tube, called a catheter.  He threads the catheter into the desired artery or vein from an access point.  The access point is usually in your groin but it can also be in your arm or, less commonly, a blood vessel in another location. This dye, properly called contrast, makes the blood flowing inside the blood vessels visible on an x-ray.  The contrast is later eliminated from your body through your kidneys and your urine.

cessation.  Advised to quit.  Discussed risks and benefits of medications to assist cessation. . . .  Discussed benefits of heart healthy diet and regular exercise.  Discussed options to maximize control of lipids [cholesterol].  Discussed importance of optimal blood pressure control and methods to achieve."  Plaintiff had a normal EKG and normal conduction.

On September 3, 2010, Stephen Kuehn, M.D., performed a coronary angiography and left heart catheterization, which revealed coronary disease (Tr. at 350-351).  Plaintiff had an ejection fraction[14] of 55% which was normal, systemic hypertension, and intermediate coronary disease.  "The patient is to be treated aggressively for primary prevention, including cholesterol reduction and both blood pressure control."  Dr. Kuehn increased plaintiff's Coreg and recommended she follow up with her primary care doctor for consideration of additional blood pressure medication.

---

[14]Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts.  During each heartbeat cycle, the heart contracts and relaxes.  When your heart contracts, it ejects blood from the two pumping chambers (ventricles).  When your heart relaxes, the ventricles refill with blood.  No matter how forceful the contraction, it does not empty all of the blood out of a ventricle.  The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat.  The left ventricle is the heart's main pumping chamber, so ejection fraction is usually measured only in the left ventricle (LV).  An LV ejection fraction of 55 percent or higher is considered normal. http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286

Two months later, on November 9, 2010, plaintiff underwent a CT scan of her chest, which revealed a few a few tiny nodules described as stable and unchanged (Tr. at 348). A previously noted nodule had resolved.

Four months later, on March 14, 2011, plaintiff saw Dr. Ellis for a follow up on Langerhans histiocytosis (Tr. at 306–308). Dr. Ellis noted that there had been no evidence of disease recurrence since August 2005.

> I am seeing Brenda today for scheduled followup of her Langerhans histiocytosis. In the interim overall she has felt well. She was last scanned in November 2010, which showed no new mass or lesion. Very stable and actually improved overall. She denies any changes in her respiratory status. No new shortness of breath or cough. She had no new bone pains or adenopathies. She continues to have pain in her hip and lower back which is stable and well controlled with her use of morphine. She continues to follow up with Dr. Landholt and Dr. Rosario for hypertension. She reports a moderate amount of fatigue but is stable and continues to stay slightly active as much as possible. She has no new concerns at today's visit.

Plaintiff did not mention vomiting. She denied dizziness. Her blood pressure was 227/109. Her weight was 145.4 pounds. On exam she was described as "well nourished." Dr. Ellis heard no wheezes, rales or rhonchi. Her abdomen was nontender. She had some tenderness in the paraspinous area around T9, 10 and 11. She was alert and oriented times three, her judgment was normal, her insight was normal. She was assessed with Langerhans histiocytosis, severe uncontrolled hypertension, and "pain.

Overall better control." He made no changes to her treatment
regimen.

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge Kenton Fulton entered his opinion
on June 17, 2011 (Tr. at 10–17). Plaintiff's last insured date
was December 31, 2013 (Tr. at 12).

Step one. Plaintiff has not engaged in substantial gainful
activity since her alleged onset date (Tr. at 12).

Step two. Plaintiff has the following severe impairments:
type II diabetes mellitus, hypertension, degenerative joint
disease, and Langerhans histiocytosis (Tr. at 12).

Step three. Plaintiff's impairments do not meet or equal a
listed impairment (Tr. at 12).

Step four. Plaintiff retains the residual functional
capacity to perform light work. She can lift and carry 10 pounds
frequently and 20 pounds occasionally, and she needs the ability
to alternate sitting, standing and walking every 30 to 60 minutes
throughout the workday (Tr. at 12–13). Plaintiff's subjective
allegations of disabling symptoms are not entirely credible.
Plaintiff is capable of performing her past relevant work as an
administrative clerk (Tr. at 16).

## VI.  CONSULTATIVE EXAM

Plaintiff argues that the ALJ erred in refusing to order a consultative exam with memory testing.  "Plaintiff testified at [the] hearing that her medications make her tired and cause her to experience short-term memory problems." (plaintiff's brief at page 9).  Plaintiff's argument that the ALJ ignored medical records "showing prescriptions for Clonidine which is used to treat both high blood pressure and attention deficit, anxiety, and pain disorders" is unpersuasive.  The evidence is clear that plaintiff was treated for severe uncontrolled hypertension, not for attention deficit or anxiety.  The medical records show absolutely no basis for a mental health evaluation.

> The regulations . . . do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment.  They simply grant the ALJ the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination. 20 C.F.R. § 416.917(a); Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986) (per curiam); Landsaw v. Secretary of Health and Human Services, 803 F.2d 211, 214 (6th Cir. 1986).  Thus, the issue is whether the record contained sufficient medical evidence for the ALJ to make an informed decision as to [the claimant's] alleged mental impairment.

Matthews v. Bowen, 879 F.2d 422, 424 (8th Cir. 1989).

In this case, the only evidence in the record suggesting a mental impairment was plaintiff's non-credible administrative hearing testimony.  On the other hand, there is sufficient evidence in the record of no severe mental impairment for the ALJ to have made an informed decision in that regard.

Plaintiff was regularly using narcotic pain medication and hypertension medication since as far back as 2005, years before her alleged onset date, and was able to work at the substantial gainful activity level despite any allegations of memory or concentration impairment as a side effect of medication.

In September 2007 while at the hospital plaintiff denied depression, and on exam she was observed to be alert and oriented times three with normal mood and affect. In December 2007 Dr. Ellis observed that plaintiff was pleasant, alert and oriented times three. On February 28, 2008, at the hospital plaintiff's mood and affect were observed to be normal. She denied depressed mood, anxious mood, or problems sleeping. In July 2008, during plaintiff's final hospitalization, her mood and affect were observed to be normal, she was alert and oriented times three. In June 2009 –– on plaintiff's first doctor visit after her alleged onset date –– she was observed to be pleasant, alert and oriented times three. In September 2009 during a consultative exam in connection with her application for disability benefits, plaintiff did not report any mental symptoms at all. Her affect was normal, her personal hygiene was good, she was able to follow simple instructions, and her communication skills were decent. In January 2010, plaintiff denied depression, and she was observed by Dr. Steinberg to be alert and oriented times three. In August 2010, Dr. Ellis observed that plaintiff was alert and

oriented times three, her judgment was normal, her insight was normal.  In September 2010, Dr. Rosario observed that plaintiff was alert and oriented, her behavior and affect were appropriate. In March 2011, plaintiff was observed to be alert and oriented times three, her judgment was normal, her insight was normal.

Plaintiff never complained to any doctor over this seven-year period of any problems with any mental symptoms.  The ALJ had sufficient medical evidence to make an informed decision regarding the existence of any mental impairment.  No consultative examination was warranted.

## VII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in finding that plaintiff can perform a job with a sit/stand option every 30 to 60 minutes.  "The ALJ has no medical support for finding that Sprague is capable of performing work if she is allowed to alternate between sitting and standing every 30-60 minutes.  Such a finding cannot be supported by substantial evidence." (plaintiff's brief at page 12).  Plaintiff's argument is without merit.

A claimant's residual functional capacity is defined as the most that a claimant can still do despite his physical or mental limitations. 20 C.F.R. § 404.1545(a); Leckenby v. Astrue, 487 F.3d 626, 631 n.5 (8th Cir. 2007).  When determining a claimant's residual functional capacity, an ALJ should consider all relevant

evidence, including medical records, observations from treating physicians, and the claimant's subjective statements about his limitations. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ's residual functional capacity finding must be supported by some medical evidence. Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (finding that the ALJ's finding was supported by medical evidence because the ALJ relied on the claimant's treatment records). The burden of proving disability based on the residual functional capacity remains on the claimant. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008); Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005).

Here the record supports a finding that the ALJ actually gave plaintiff the benefit of the doubt in finding that she would need a sit/stand option at all. In August 2005, she had good ambulation. In January 2007 despite complaining of leg pain, plaintiff was able to go up and down stairs, she had full range of motion and only "mild discomfort" with seated straight leg raising on the left (straight leg raising was later found to be normal). She had only mild arthritic changes and physical therapy was recommended. In September 2007 she reported pain in her back and hip, but she was still able to work full time. In December 2007 she reported some aching in her right femur but her physical exam was normal. In July 2008 plaintiff had no weakness, no range of motion restriction, and no tenderness in

43

any joint.  In June 2009 (after plaintiff's alleged onset date),
plaintiff reported worsening of bone pain in her back, pelvis and
right arm; however a bone scan showed only a stable right leg
where she previously had surgery, and some degenerative changes
in her spine and pelvis.  The remainder of her skeleton was
unremarkable and stable.  An MRI of the right hip showed only
mild degenerative changes.  In September 2009, plaintiff told Dr.
Zeimet that she can sit, stand or walk for about an hour at a
time each.  She did not need any assistive device.  Plaintiff was
able to get out of a chair and on and off the exam table without
difficulty.  Her range of motion was entirely normal.  She could
heel-to-toe walk, walk on heels and toes, and squat.  Straight
leg raising was normal.  Based on all of that Dr. Zeimet found
that plaintiff "may need to alternate positions to alleviate pain
periodically throughout the day."

    In December 2009, plaintiff reported pelvic and hip pain to
Dr. Ellis who found no joint tenderness and no muscle tenderness.
He recommended a bone survey which was unchanged since 2007 when
plaintiff was working full time.  In January 2010, in connection
with a lung biopsy, plaintiff denied muscle pain or new joint
pain.  She denied muscle atrophy or weakness.  On exam abnormal
findings were denied.  In August 2010, plaintiff reported
increasing pain in her back; however, Dr. Ells assessed "pain,
overall better control".  He ordered a hip x-ray which showed

only degenerative changes, and an MRI of her thoracic spine which showed only mild degenerative changes. In September 2010, Dr. Rosario observed that plaintiff's gait was normal, she had normal muscle strength and tone. He recommended regular exercise. In March 2011, plaintiff told Dr. Ellis that overall she was feeling well. She had no new bone pains or adenopathies. She continued to have pain in her hip and lower back which was noted to be stable and well controlled with her use of medication.

Furthermore, in her Function Report plaintiff said she reads for an hour at a time and then gets up and moves around to stop the cramping.

Because the medical records show that plaintiff had adequate control of her pain with medication; her MRIs, x-rays, bone scans, and CT scans all reflected mild findings; the test results were unchanged from several years before plaintiff's alleged onset date; she never voiced a difficulty with sitting or standing to any doctor; no one ever recommended she limit her sitting, standing or walking other than Dr. Zeimet who suggested she may need to have a sit-stand option; plaintiff herself told Dr. Zeimet that she could sit, stand or walk for an hour at a time each; and plaintiff stated in her Function Report that she reads for an hour at a time before needing to get up to move around, I find that the ALJ did not err in finding that plaintiff would need a job that would permit her to change her position

every 30 to 60 minutes.

Plaintiff also argues that the ALJ erred in discounting the opinion of Dr. Ellis, plaintiff's treating physician. Plaintiff fails to point to what opinion she thinks the ALJ should have given more weight; however, because none of Dr. Ellis's records show any limitation other than his completion of a form for a disability placard, I will assume this is the opinion to which plaintiff is referring. Checking a box on a form to get a disabled license plate is not substantial evidence of a physical limitation, especially when the doctor who completed the form never mentioned any of those limitations in any of his records, either as complaints by his patient or as findings by him or any specialist to whom he referred the patient. Plaintiff's argument is completely without merit.

Next plaintiff argues that the ALJ erred in failing to accommodate plaintiff's frequent vomiting when assessing her residual functional capacity. Plaintiff's allegations of constant vomiting are not credible.

On September 12, 2007, plaintiff reported vomiting for the past 2 to 3 days. She was hospitalized with pancreatitis. On February 28, 2008, she reported vomiting that started the day before. She was hospitalized with pancreatitis. On March 8, 2008, plaintiff saw Dr. Landholt and denied vomiting. On July 2, 2008, plaintiff reported vomiting for the past week and a half.

She was hospitalized with pancreatitis.  On September 19, 2009, plaintiff told Dr. Zeimet -- in connection with her disability case -- that she "vomited a lot", at least two times a day, and that the reason she stopped working was due to frequent vomiting. Less than three months later, she saw Dr. Ellis for treatment and did not mention vomiting.  She saw Dr. Wolfe for treatment on January 8, 2010, and did not mention vomiting.  She saw physician's assistant Crystal Powell on February 4, 2010 (less than a month later) and reported vomiting at least three times a day, often much more.  Ms. Powell recommended an upper GI; however, there are no records of an upper GI and in fact plaintiff had no further medical records for the next six months. On August 9, 2010, plaintiff saw Dr. Ellis for treatment and did not mention vomiting.  On September 2, 2010, plaintiff saw Dr. Rosario for treatment and did not mention vomiting.  On March 14, 2011, plaintiff saw Dr. Ellis for treatment and did not mention vomiting.  Dr. Ellis observed that plaintiff was "well nourished."

Comparing those records to her administrative paperwork, one finds extreme exaggeration.  On August 14, 2009, in a Function Report plaintiff said she can only eat soup to keep from vomiting and that she wakes up several times a night due to vomiting.  In an undated Disability Report Appeal, plaintiff reported vomiting "all day long."  In her testimony on April 6, 2011, she said she

vomits at least four times a day and she quit working because she vomits all the time.  Yet three weeks before the hearing, she had seen Dr. Ellis for treatment and had not mentioned vomiting, and she was observed to be well nourished.

Plaintiff attempts to bolster her allegations of frequent vomiting by claiming that her weight loss was attributable to her vomiting.  There is no merit to this contention.  A record of plaintiff's weight follows:

- 04/18/2005 – 177 pounds
- 05/09/2005 – 179 pounds
- 08/12/2005 – 173 pounds
- 11/03/2005 – 177 pounds
- 02/06/2006 – 181 pounds

FIRST HOSPITALIZATION FOR PANCREATITIS – SEPTEMBER 2007

- 12/20/2007 – 178 pounds

SECOND HOSPITALIZATION FOR PANCREATITIS – FEBRUARY 2008

- 03/12/2008 – 163 pounds
- 04/04/2008 – 169 pounds

THIRD HOSPITALIZATION FOR PANCREATITIS – JULY 2008

- 07/10/2008 – 147 pounds
- 06/30/2009 – 138 pounds
- 08/03/2009 – plaintiff alleged in a disability report that she weighed 118 pounds
- 09/19/2009 – 133 pounds
- 01/02/2010 – 142 pounds
- 01/08/2010 – 145 pounds
- 02/04/2010 – 142 pounds
- 08/09/2010 – 147.6 pounds
- 09/02/2010 – 150 pounds

- 03/14/2011 – 145.4 pounds
- <span style="color:red">04/06/2011 – plaintiff alleged at the hearing that she weighed 132 pounds</span>

The medical records clearly show that plaintiff's weight loss occurred after each hospitalization for pancreatitis, during which she received no oral nutrition or hydration for multiple days. The medical records also clearly show that plaintiff's weight continued to go up gradually during the time she alleges she was vomiting multiple times every day and every night.

Furthermore, in a Disability Report plaintiff claimed that her weight loss was due to loss of appetite, not vomiting. On January 2, 2010, Dr. Steinberg noted that plaintiff specifically denied unintentional weight loss.

There is no credible support in the record for plaintiff's assertions. I find that the ALJ's residual functional capacity assessment is supported by the record.

## *VIII. CONCLUSIONS*

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 4, 2014